445 So.2d 477 (1984)
George Nolan BURNHAM, Jr., Plaintiff-Appellant,
v.
FREY-SHOEMAKER-COLBERT-BRODNAX, et al., Defendants-Appellees.
No. 15864-CA.
Court of Appeal of Louisiana, Second Circuit.
January 16, 1984.
Rehearing Denied February 23, 1984.
*479 Edmund M. Thomas, Shreveport, for plaintiff-appellant.
Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, for defendant-appellee Frey-Shoemaker-Colbert-Brodnax.
Cook, Yancey, King & Galloway by Charles G. Tutt, Shreveport, for defendant-appellee Gang Nail Truss Co. of Shreveport, Inc.
Lunn, Ipion, Switzer, Johnson & Salley by Jack E. Carlisle, Jr., Shreveport, for defendants-appellees Zion Church Builders and Designers, Inc., Imperial Casualty Co. of Omaha, and the National Ben Franklin Ins. Co.
Rountree & Hicks by S. Maurice Hicks, Jr., Shreveport, for intervenor-appellee Commercial Union Ins. Co.
Before PRICE, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Plaintiff sued defendants in tort for injuries incurred when the trusses plaintiff was helping erect collapsed. Plaintiff's claims were tried before a jury which found one defendant and its insurer liable and awarded plaintiff a judgment in the amount of $60,000. In plaintiff's appeal, we amend to increase the award, and as amended, affirm.
Plaintiff in this cause is George Burnham, Jr., who was 18 years of age at the time of the injury which is the subject of this appeal. One defendant is Zion Church Builders and Designers, Incorporated (hereinafter referred to as Zion), the construction firm that provided the superintendent that supervised the construction project at which plaintiff was injured. Additional defendants are Zion's insurers, Imperial Casualty and Indemnity Company of Omaha, Nebraska (hereinafter referred to as Imperial Casualty), and National Ben Franklin Insurance Company (hereinafter referred to as Franklin Insurance).
Plaintiff filed suit in 1980. In addition to Zion and its insurers, Imperial Casualty and Franklin Insurance, plaintiff joined as a defendant, Gang Nail Truss Company of Shreveport, Incorporated, the designer and manufacturer of the trusses used on the job site; plaintiff also sued Frey-Shoemaker-Colbert-Brodnax the architectural firm which designed the Life Tabernacle Gymnasiumand its insurer Continental Casualty Company. A petition of intervention was filed by Commercial Union Insurance Company, the workers' compensation insurer of Life Tabernacle, which paid medical and disability benefits to George Burnham, Jr.
*480 Gang Nail was dismissed from the suit by a summary judgment rendered January 21, 1982. Plaintiff tried his claims against the remaining defendants, Zion and Frey-Shoemaker, in January of 1983. The jury found that Frey-Shoemaker was not negligent, but awarded judgment in plaintiff's favor and against Zion and its insurers in the amount of $60,000. The amount due compensation insurer Commercial Union Insurance was stipulated at trial to be $35,609.96. Plaintiff contractually compromised his appellate claims against Frey-Shoemaker, subsequent to trial, for $5,000.
The only parties to the instant appeal are thus plaintiff George Burnham, Jr., and defendant Zion and its insurers. The $35,609.96 amount due intervenor Commercial Union Insurance Company has not been contested on appeal. Zion has not challenged its liability by appeal. Therefore, the only issue to be addressed in this appeal is the contention of plaintiff-appellant George Burnham, Jr., that the jury's damage award of $60,000 was insufficient and constituted an abuse of discretion.
On May 10, 1979, plaintiff was employed as a carpenter, in the construction of a gymnasium at the New Life Center of Life Tabernacle, in Shreveport, Louisiana. On that date, Burnham was engaged in erecting the trusses that were to be used to support the gymnasium ceiling. While plaintiff was at the ceiling level guiding crane-raised trusses into place, several trusses collapsed without warning, causing plaintiff to fall some thirty to thirty-five feet onto the concrete floor of the gymnasium.
The impact shattered the bones in both of his wrists. Plaintiff's face was bleeding profusely, and he was unable to talk because his jaw was not functioning. Plaintiff's upper chest was bruised and lacerated, and the impact knocked out one of plaintiff's teeth, and fragments of three others.
Plaintiff was taken to the emergency room of Willis-Knighton Hospital in Shreveport. X-rays taken upon plaintiff's admittance revealed that he had suffered comminuted fractures of both wrists, and a fractured jaw. Surgery was performed that same day by Dr. David Waddell, who surgically implanted a metal pin in each of plaintiff's elbows. A metal pin was also placed through the dorsal bones of each of plaintiff's hands. Casts were placed on each of plaintiff's arms, which extended from just beyond the knuckles of each hand to plaintiff's shoulders. Plaintiff was strapped to his hospital bed, and his hands were suspended from a traction bar overhead. The four metal pins implanted in plaintiff's arms and hands were utilized to enable weights to be hung from each elbow, as plaintiff's arms were suspended above him in traction. These weights were in turn utilized to pull back apart the wrist joints that had been severely compressed by plaintiff's impact with the concrete floor of the Life Tabernacle's gymnasium.
Additionally, metal braces were placed on plaintiff's teeth during the initial surgery. In a second surgery performed the same day (May 10, 1979), oral surgeon Dr. W. Hardy Worley wired plaintiff's jaw shut in order to facilitate the healing of the fracture in plaintiff's jaw. George Burnham, Jr. was discharged from Willis-Knighton on May 14, 1979, after five days confinement there.
Plaintiff underwent several post-surgical medical adjustments and procedures. On one occasion, plaintiff reported to the emergency room because of a sharp pain in his elbow. Dr. Waddell treated plaintiff on that occasion by removing part of one of plaintiff's two arm casts, and extracting the metal pin from one of his elbows. Plaintiff returned to the emergency room that same night because the pain had not subsided. At that time, Dr. Waddell gave plaintiff a sedative, cut off his cast at the hand, and removed the metal pin from the back of his hand.
On another occasion, the pin in plaintiff's right wrist slipped and "the doctor took a hammer and knocked it back in." The doctor then wrapped the wrist with a new plaster cast, to prevent the pin from coming loose again. This remedial procedure *481 was unsuccessful, and on May 25, 1979, plaintiff was readmitted to the hospital. The following day, Dr. Don Joffrion performed surgery on the plaintiff. Dr. Joffrion removed plaintiff's right cast, extracted a pin from plaintiff's right wrist, implanted four new metal pins in plaintiff's wrist, and then replaced the cast.
On June 17, 1979, plaintiff returned to surgery for a third time. During this third surgery, doctors removed the metal braces from plaintiff's teeth, unwired his jaw, removed the long casts on each of plaintiff's arms, and extracted the metal pins that had been implanted in plaintiff's wrists and elbows. Short arm castswhich extended downward from plaintiff's elbowswere placed on plaintiff's arms. Plaintiff was discharged on June 19. Plaintiff's short casts remained on for another month, until July 17, 1979.
During plaintiff's confinement in the longer set of plaster casts, he was unable to bathe, feed or otherwise care for himself, and depended on his mother and brothers. During the roughly five week period plaintiff wore the long casts, he was able to walk only with the aid of two slings around his neck to support both casts. During the roughly five week period that plaintiff's jaw was wired shut, he was restricted to a liquid diet and lost forty pounds from his 150 pound frame. Following the removal of the latter set of short arm casts, plaintiff undertook a regimen of exercises and physical therapy to regain use of his wrists.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Miller v. Thomas, 246 So.2d 16 (La.1971); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir.1978). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Alexander v. Leger, 423 So.2d 731 (La.App. 3d Cir.1982); Greene v. Wright, supra.
Thus, in evaluating the adequacy of plaintiff's award, we seek to determine what is the lowest acceptable award for damages which the jury could assess. We first of all look to the proof of special damages to subtract those from the award of the jury, since the jury award was not itemized. It was stipulated that plaintiff had $9,060.96 in medical expenses. Furthermore, the evidence reflects that in all likelihood plaintiff will require an operation in the future that will cost approximately $4,000.00. These two items are specific and uncontroverted.
Of a somewhat more speculative nature is the evidence with respect to plaintiff's lost wages. Plaintiff was employed at the rate of $6.00 an hour at the time of his injury. The uncontroverted projection of economist Dr. Wolfson was that plaintiff, working steadily at the rate of $6.00 an hour, would have earned $43,857.00 before taxes and $37,278.00 after tax during the roughly 3.65 year period between the time of his injury and the time of trial. Considering the cyclical nature of plaintiff's employment, it is not certain that plaintiff would have worked steadily at the rate of $6.00 an hour during this period. But in considering this item of damages, we are mindful of plaintiff's aggressive employment history.
Plaintiff's work history reveals that he was a very industrious and skillful worker, prior to his disabling injury. George Burnham, Jr. began working at ten years of age by carrying construction materials, and assisting *482 his father, a carpenter. By the time he was thirteen years of age, plaintiff assisted his father in the construction of homes by building door frames and window frames. He assisted his father on weekends, and during holidays and summer vacations. In the seventh grade, plaintiff worked as a bus boy at night. Plaintiff thereafter continued to assist his father doing carpentry work, including layout work. When plaintiff's father had his stomach surgically removed while plaintiff was in the 11th grade, plaintiff quit school to help support his family. Upon quitting school, he initially worked building and remodeling housing. When his employer ran out of work for him, plaintiff secured employment on a garbage truck. In November of 1977, at age 17, he went to Baton Rouge to secure employment with the construction firm which had employed his father. After initially being unable to secure employment, plaintiff volunteered his services in the construction of a Baton Rouge church his father was helping to build. After working without pay for two weeks, the church's pastor placed plaintiff on the payroll, and plaintiff continued to work there as a carpenter's helper for some eight months, until completion of the job in June of 1978. Three weeks later, plaintiff obtained work in the construction of the Life Tabernacle facilities in Shreveport, at which job he was engaged at the rate of $6.00 an hour for some ten months prior to the date of the accident.
We therefore believe that if plaintiff had been unable to obtain work at $6.00 an hour he would nevertheless have aggressively attempted employment at a lower rate. We conclude that an award of $25,000.00 for lost wages in this case is conservative.
Adding together this $25,000.00 as a minimum for loss of past wages, the just over $9,000.00 of stipulated medical expenses, and the $4,000.00 necessary for future surgery produces a total of $38,000.00. Subtracting these items of special damages from the $60,000 awarded, and assuming the jury did not accept plaintiff's position with respect to future wages, then only $22,000.00 was awarded as general damages. This sum is inadequate.
We have already detailed the serious extent of plaintiff's initial injuries and his arduous period of recovery. Plaintiff currently has lingering pain, which Dr. Waddell likened to that associated with degenerative osteoarthritis. Plaintiff testified that his pain, which is present on a daily basis, fluctuates from a dull ache to a more acute pain. The prognosis is that plaintiff's pain will continue for the rest of his life, as his wrist condition gradually degenerates.
Prior to his injury, plaintiff was extremely active in physical pursuits including hunting, horseback riding, mechanics, baseball, boxing, and pool tournaments. Plaintiff appeared to derive satisfaction from his work as a carpenter, but he is presently unable, without at least some pain, to do a number of routine tasks such as removing a top from a soda bottle or turning a door knob. Plaintiff's use of his wrists in recreation and employment will, in the view of his treating physician, accelerate his disability, and increase the possibility of additional surgery, including fusion of both wrists. In simple terms, plaintiff's injury has irrevocably altered his entire lifestyle and reduced or taken from him many activities which he enjoyed. The injury has caused plaintiff understandable depression and anxiety.
Based on these factors, we conclude that $60,000 is the minimum award acceptable for general damages.
We now approach the most difficult issue in this appeal, which is the extent of plaintiff's loss of future wages, if any. Even if the plaintiff is unable to do strenuous work, the burden is on him to prove that he can do no other work, or that because of his disability he will suffer a loss of income. Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982); Profit v. Lynn, 346 So.2d 253 (La.App. 1st Cir.1977). In making this evaluation we are to consider plaintiff's physical condition prior to the accident, his work record, the *483 extent of his earnings, and the probability that he would have been able to earn similar amounts for a number of years but for his disability. Viator v. Gilbert, 216 So.2d 821 (La.1968).
It is implicit in the state of the record is that the jury made no award for loss of future wages to this plaintiff. The only evidence which would authorize such a result were the two paychecks introduced by defendant which plaintiff received between the time of his injury and the trial for work allegedly performed at a Plano, Illinois work site where his father was construction superintendent. The defense attempted to establish, through this evidence, that plaintiff was not in fact disabled from engaging in manual labor. The plaintiff's version was that he received this pay for taking two unemployed friends to the Illinois site to assist his father who was attempting to procure non-union help on that job. Plaintiff further testified that he did not do any of the actual driving from Shreveport to Illinois and that he did not perform physical labor there, but merely instructed and "supervised" his friends who were not experienced in carpentry. One of defendant's witnesses present at the site conceded he did not see plaintiff perform any physical labor. It should be noted that, initially, plaintiff conveniently failed to recall receiving these checks.
However, we believe that this evidence is tenuous when compared with the total record in this case. Any implied finding that plaintiff has the ability to engage in long-term meaningful work is not established by this evidence and is contrary to the clear medical evidence, and thus is clearly wrong.
The trial record establishes by a preponderance that the wrist injuries plaintiff received in his fall on May 10, 1979, have permanently incapacitated him from engaging in the carpentry work in which he was engaged in at the time of his injury; the evidence establishes that he has been disabled from work for which he was equipped by training and experience.
Plaintiff received comminuted fractures in both wrists in his 30-35 foot fall to the concrete floor of the Life Tabernacle gymnasium. The bones in both wrists were severely shattered. Treating surgeon, Dr. Waddell, likened the effect of the debilitating impact upon plaintiff's wrists to the shattering of a plate with a mallet. As Dr. Waddell stated, plaintiff's comminuted wrist fractures had occurred in such a way that "there are numerous small pieces of bone and there is not just one simple fracture line." Dr. Waddell further explained that:
"... there are numerous small fragments of bone which we note from past experience in dealing with such injuries that are very very small even beyond the point where it would be physically possible to re-approximate each piece of bone together and reconstruct the distal joint.... If you were to physically open that fracture area, you would have literally a bag of several small pieces of bone that you couldn't put back together."
Dr. Waddell assigned a 25% permanent partial physical impairment to the left wrist, and a 35% permanent partial physical impairment to the right wrist. Dr. Waddell stated that there was a "good probability" that plaintiff would have to undergo further surgery in the future, and alluded to the possibility that his wrists might even have to be surgically fused, which fusion would eliminate all mobility and movement of the wrists. It was Dr. Waddell's view that plaintiff's condition would probably deteriorate. Moreover, Dr. Waddell asserted that manual labor would increase the likelihood of additional surgery, and accelerate the deterioration of plaintiff's wrists. Dr. Waddell stated, more specifically, that plaintiff's "joints are not normal [subsequent to the impact] and it would be advisable to avoid as much stress on them as possible," and that stress would accelerate "degenerative arthritis."
Dr. Waddell's testimony as to the extent and severity of plaintiff's injuries was corroborated by the testimony of plaintiff's family. Plaintiff cannot twist the cap off a *484 soda bottle; needs assistance in opening a coke bottle or car door; must use two hands in opening the door to a pickup cab; experiences pain in trimming his fingernails, or driving a car; and turns a doorknob by clutching it with both hands and twisting his arms.
Moreover, plaintiff is not equipped by education or natural endowment for white collar employment. Plaintiff's formal education ended approximately one-third of the way through eleventh grade. Plaintiff's education previous to that time was acquired in eleven different schools, because of frequent moves made by his family. In a Wide Range Achievement Test administered to plaintiff prior to trial, plaintiff registered an 8.6 grade equivalency in reading, a 7.7 grade equivalency in spelling, and a 6.9 grade equivalency in arithmetic. Plaintiff achieved an 8.9 grade equivalency on the Slasson Oral Reading Test. The uncontroverted opinion of rehabilitation specialist Dr. Richard Galloway, based on these scores, was that plaintiff was a "very poor candidate for collegiate work."
We have elsewhere reviewed plaintiff's willingness and ability to work as reflected by the record. Thus in summary the record establishes plaintiff's entitlement to an award for future wage loss because of this demonstrated willingness and ability to work, his exemplary past work record, his present medical disability, and his present physical incapacity to perform the same kind of work in which he was engaged at the time of his injury, or to perform work for which he is equipped by education, experience and endowment.
However, our analysis of the record does not cause us to believe that plaintiff has sufficiently proven that he is unable to do any type of work whatsoever in the future. As we noted earlier herein, it is his burden to do so, and furthermore, our task is to set the minimum acceptable award.
Plaintiff's economic expert, Dr. Melville Wolfson, testified that plaintiff had a work life expectancy of 39 years from the time of trial; plaintiff would have been making $7.00 an hour at the time of trial; plaintiff would have experienced an after-tax 4.6% annual income growth rate in that $7.00 an hour base amount; plaintiff would have averaged 38.5 work hours per week; plaintiff would have remained a production worker, and would not have attained a supervisory position or higher job classification.
Dr. Galloway asserted at trial that next to an employee's eyes, his hands constitute his most essential physical asset in terms of employability. Because of the impairment of plaintiff's hands and wrists, and because he is not suited by natural capability or education for clerical or administrative work, Dr. Galloway stated that plaintiff is a marginal minimum wage worker. This is borne out by plaintiff's inability to find employment between his injury and the time of trial despite unsuccessful attempts to find work as a hardware salesman, a construction supervisor trainee, or a burglar alarm installer. He was turned down by a fast food chain because he could not make hamburger patties quickly enough. As was stated by rehabilitation specialist Dr. Galloway, there is very little demand in a recessionary labor market for manual laborers who have no college education and are unable to put stress on their hands or wrists.
The approach of Dr. Wolfson is conservative and supported by the jurisprudence. See generally, Holmes v. Texaco, Inc., supra; Payton v. Travelers Insurance, Co., 373 So.2d 1324 (La.App. 4th Cir.1979); Greene v. Wright, supra.
It thus becomes our task to establish the minimum acceptable award in this regard. Coco v. Winston Industries, Inc., supra. Considering the factors which we have enumerated, and the likelihood reflected by the evidence that plaintiff will only be able to obtain minimum wage employment or slightly better for the remainder of his work life, we determine that $150,000 as lost wages is the minimum acceptable amount in this regard.
*485 Therefore, in summary, we amend and increase the award to plaintiff herein to reflect an award of $9,060.00 for past medical expenses, $4,000.00 for future medical expenses, $25,000.00 for past lost wages, $60,000.00 in general damages and $150,000.00 for loss of future wages for a total of $244,060.00; and as amended, the judgment of the trial court is affirmed.
Therefore, it is hereby ORDERED, ADJUDGED and DECREED that the judgment herein as rendered be amended and increased to the sum of $244,060.00, and as amended is affirmed, at defendant's cost.
AMENDED, and AS AMENDED, AFFIRMED.