522 So.2d 1144 (1988)
Nancie Kellene HUNT, Plaintiff-Appellee,
v.
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, et al., Defendants-Appellants.
No. 19331-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1988.
*1146 A. Mills McCawley, Shreveport, for defendants-appellants.
Edmund M. Thomas, Shreveport, for plaintiff-appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
This is a medical malpractice case in which the plaintiff, Nancie Kellene Hunt, recovered a judgment of $275,000 against the LSU Board of Supervisors. The defendant appealed, claiming the trial court erred in allowing recovery and alternatively that the amounts awarded by the trial court were excessively high. The plaintiff answered the appeal, asserting that the amounts awarded by the trial court were too low. For the following reasons, we amend in part the trial court judgment, and, as amended, we affirm.

FACTS
On November 6, 1983, the plaintiff, then age 21, was admitted to LSU Medical Center in Shreveport for childbirth. The plaintiff's regular physician was not on duty and the plaintiff was attended by Dr. Steven McRae Brazeel, a second year family practice resident. The plaintiff was suffering from pregnancy induced hypertension, a condition which can potentially lead to seizures and death. Proper treatment of this condition calls for a series of intramuscular injections of 10 ccs of magnesium sulfate. One such injection was administered around 6:00 p.m., shortly before the birth of the child. The injection was given by Dr. Brazeel with a 20 gauge bevelled needle which was two and one-half inches in length.
Proper administration of such injections calls for insertion of the needle into the upper outer quadrant of the buttocks in order to avoid the sciatic nerve which runs through the buttocks into the leg.
When Dr. Brazeel inserted the needle, it struck the plaintiff's sciatic nerve, causing her leg to jerk. The plaintiff complained of sharp burning pain radiating down the leg and into her right foot. Dr. Brazeel partially withdrew the needle, allegedly redirected it, and injected the magnesium sulphate.
The plaintiff continued to experience numbness in her leg and testified she had difficulty getting onto the delivery table. The plaintiff delivered a healthy child, but continued to experience pain in her leg and developed a "foot drop" syndrome in her right foot accompanied by pain and numbness.
On June 18, 1984, the plaintiff filed suit against the LSU Board of Supervisors, LSU Medical Center in Shreveport and unknown employees of LSU Medical Center who were on duty November 6, 1983, claiming that her sciatic nerve had been permanently damaged, that she would suffer permanent pain and that as a result of her injury, she could not find employment.
A long trial ensued in which both plaintiff and defendant offered extensive medical testimony to establish how this injury occurred. The plaintiff presented numerous medical experts who all agreed that if the injection had been properly administered in the upper outer quadrant, the sciatic nerve would not have been injured. The plaintiff also presented medical testimony that her injury was caused by the injection of the magnesium sulfate into the nerve and not merely because the nerve was struck by the needle. The plaintiff's medical experts also testified that the proper procedure for redirection of the needle called for the needle to be withdrawn at least to the level of the skin. The experts testified that the procedure used by Dr. Brazeel in withdrawing the needle only one inch resulted in the needle following the original path upon reinsertion and restriking the nerve.
The defendant argued that Dr. Brazeel properly redirected the needle into the upper outer quadrant and injected the magnesium sulfate into the fatty planes of the plaintiff's buttocks. The defendant then *1147 argued that the magnesium sulfate migrated from the injection point to the sciatic nerve and caused the damage. Defendant also argued that the plaintiff's injury did not manifest itself immediately, but worsened over the passage of time, consistent with the theory that the nerve damage was caused by migration of the medication, and was therefore not caused by the fault of the doctor who administered the injection.[1]
In reasons for judgment, the trial court rejected the defendant's theory and found that the plaintiff experienced immediate pain when injected. The court found there were only two ways the injury could have occurred. First, the doctor hit the sciatic nerve, and injected some or all of the magnesium sulphate into the nerve, or second, the doctor struck the nerve but failed to redirect the needle a sufficient distance, struck the nerve a second time upon reinserting the needle and injected the nerve with magnesium sulphate.
The court found that the plaintiff would continue to have a noticeable limp in her right foot and that the prognosis for relieving the plaintiff's pain in the future was not good. The trial court awarded the plaintiff $175,000 for past, present and future pain and suffering, disability and future medical expenses. The court also found that the plaintiff's ability to engage in gainful employment was restricted by her injury and awarded her $100,000 in lost wages. The court awarded the plaintiff $250 for each of eleven medical experts who testified at trial.
On October 3, 1986, the defendant filed a motion for new trial which was denied by the trial court.
The defendant appealed, claiming the trial court erred in finding that the defendant had violated the applicable standard of care so as to allow a medical malpractice recovery against it. In the alternative, the defendant argues that the amount of damages awarded by the trial court was excessive.
The plaintiff answered the appeal, claiming that the trial court erred in awarding inadequate sums for general damages, loss of earnings and future earning capacity. The plaintiff also claims that the trial court erred in failing to award past medical expenses and erred in fixing an inadequate award for expert witness fees.
The plaintiff argues she should have been awarded at least $600 for each expert witness, $310,000 in general damages, $312,023.94 in lost past and future earning capacity and $804.87 in past medical expenses. The plaintiff recognizes that there is a statutory ceiling on medical malpractice awards against the state of $500,000 and, although she claims damages totaling $622,828.81, suggests that the total award be set at the $500,000 ceiling.

LIABILITY
The defendant argues that the trial court was manifestly erroneous in concluding that the defendant violated the community standard of care so as to find medical negligence, thereby allowing plaintiff to recover damages. The defendant claims the record clearly demonstrates a lack of negligence. This argument is meritless.
LSA-R.S. 9:2794 sets forth the applicable standard of care in medical negligence cases. That statute provides in pertinent part:
(A) In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff *1148 has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
This statute provides a different standard of care for general practitioners than that required for medical specialists. Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953); Ardoin v. Hartford Accident and Indemnity Company, 360 So.2d 1331 (La.1978). A general physician or surgeon is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. He must use reasonable care along with his best judgment in the exercise of that skill. Matthews v. Louisiana State University Medical Center, 467 So. 2d 1238 (La.App. 2d Cir.1985).
When there is contradictory medical evidence, the function of the appellate court is to determine whether there is sufficient evidence before the trier of fact to furnish a reasonable basis for its findings. The appellate court will not disturb such findings in the absence of clear error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), on remand 370 So.2d 1262 (La.App.), writ denied 374 So.2d 660 (La.1979); Butts v. Cummings, 488 So.2d 1169 (La.App. 2d Cir.1986), writ denied 494 So.2d 327 (La. 1986); Matthews v. Louisiana State University Medical Center, supra; Kieffer v. Southern United Life Insurance Company, 437 So.2d 919 (La.App. 2d Cir.1983), writ denied 442 So.2d 456 (La.1983); Doss v. Hartford Fire Insurance Company, 448 So.2d 813 (La.App. 2d Cir.1984), writ denied 450 So.2d 359 (La.1984).
The defendant claims it must meet the community standard of care. However, the plaintiff contends that as a specialist in family practice, the treating physician was held to a higher standard of care.
In this case, while it appears that a family practice physician may be considered a general practitioner, held only to the community standard of care, this is an issue which need not be resolved in this case. The testimony of all the medical experts is clear that it was a deviation below any standard of care to administer this injection in any manner other than in the upper outer quadrant of the buttocks. The experts also agree that the sciatic nerve does not run in this quadrant. The experts agreed that striking the nerve with the needle could only be accomplished by improper insertion of the needle. Dr. Brazeel admitted striking the nerve on the initial insertion of the needle. The fact that Dr. Brazeel struck the nerve clearly shows that the needle was originally inserted in a substandard manner.
The experts were also in agreement that merely striking the nerve with the needle would not cause the plaintiff's injury. The true question in determining liability in this case is whether, after initially striking the nerve, Dr. Brazeel was able to successfully redirect the needle to the proper location prior to injection of the medication, or whether Dr. Brazeel caused the injury by directly injecting the nerve with the magnesium sulfate during or after the initial strike, or after failing to redirect the needle away from the nerve.
There was contradictory expert testimony on this issue. The defendant contends that the injection was properly given and that the magnesium sulfate migrated from a proper location to the area of the nerve and caused the plaintiff's injury. They contend there was no negligence on the part of the treating physician. In support of this theory, the defendant claims that the plaintiff suffered no immediate deleterious effects, but rather began experiencing pain several hours and even days after the injection.[2]
*1149 The plaintiff testified that she experienced immediate pain when the nerve was struck and had pain and difficulty moving her foot from that time on. The plaintiff presented evidence in the form of medical studies showing that the nerve would not be damaged simply by contact with the magnesium sulphate. The plaintiff also presented an expert medical witness from Parkland Hospital in Dallas, Texas who testified that in the 300,000-500,000 magnesium sulfate injections given at that institution in the last 31 years, only two cases of sciatic nerve injury have been reported. This evidence tends to discount the defendant's theory of injury due to drug migration. The plaintiff also established by a preponderance of the medical expert testimony that once the nerve was encountered with the needle, the proper method for redirection called for withdrawal of the needle to at least the level of the skin. The plaintiff's experts stated that partial withdrawal, as occurred here, would result in the needle following the original path upon reinsertion.
Based upon these factors in the record, we do not find that the trial court's conclusion regarding the defendant's liability was clearly wrong. There is ample evidence in the record to support the trial court findings that the injury was caused by inserting the needle incorrectly and then injecting the nerve with the magnesium sulphate. Therefore we do not find the trial court was clearly wrong in finding the defendant liable for the plaintiff's injury and we affirm that portion of the trial court decision.

DAMAGES
Both the plaintiff and the defendant object to the damage award made by the trial court. The plaintiff was awarded $175,000 for past, present and future pain and suffering, disability and future medical expenses. She was also awarded $100,000 in lost past and future wages. The defendant claims the damage award is so high as to constitute an abuse of discretion. The plaintiff claims the trial court erred in making inadequate awards for general damages, lost earnings and future earning capacity and erred in failing to make an award for past medical expenses. For the following reasons, we amend the award of damages made by the trial court.

Future Medical Expenses
In the present case, the trial court combined the general damage award and the award for future medical expenses into one category. In such a situation, in order to determine the lowest acceptable award for damages we must first look to proof of special damages, in this case future medical expenses and subtract those from the total award for general damages. Burnham v. Frey-Shoemaker-Colbert-Brodnax, 445 So.2d 477 (La.App. 2d Cir.1984).
After examining the record it appears the trial court did not adequately consider the extent of future medical expenses.
An award for future medical expenses is in great measure highly speculative and is not susceptible of calculation with mathematical certainty. Gaspard v. Breaux, 413 So.2d 288 (La.App. 3rd Cir. 1982). However, like any other element of damages, future medical expenses must be established with some degree of certainty. Sikes v. McLean Trucking Company, 383 So.2d 111 (La.App. 3rd Cir.1980). Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated, and setting out their probable cost. Gaspard v. Breaux, supra.
The trial court found that the plaintiff had a permanent "foot dropping" and the nerve damage led to the onset of causalgia in the plaintiff's leg. This is a condition which causes a constant burning or tingling sensation in the leg and foot. The *1150 progression of this condition leads to a cold painful limb, a whitening of the skin, loss of hair and changes in the nails. Testimony revealed that causalgia can go through four stages, resulting in a useless limb. The record also indicates that the plaintiff's causalgia is at level three.
Dr. Kenneth Gaddis, a neurologist who examined the plaintiff, found that she had lost muscle tissue in the lower leg accompanied by weakness. He also noted that the plaintiff could not move her toes, had frequent leg cramps, swelling and a bluish discoloration of the limb and that the right leg was colder than the left leg. These findings were confirmed by Dr. Charles Itzig, a general surgeon, who evaluated the plaintiff regarding the efficacy of a lumbar sympathectomy.
The plaintiff also presented evidence that the symptomology accompanying her nerve damage might have been alleviated by an operation known as a sympathectomy. However, to be effective, such an operation should be done within several months to one year after the injury. In the present case, tests conducted upon the plaintiff show that her condition has progressed beyond the point at which such treatment would be effective and that the condition is now permanent.
Following the injury, the plaintiff was placed on pain killing drugs and antidepressants. Several months after the injury, the plaintiff's treating physician prescribed Percodan to alleviate her pain. Percodan is a strong narcotic pain reliever. She continued taking Percodan for an extended period of time and was eventually taken off the drug in order to avoid addiction.
The record indicates that the plaintiff has a permanent partial disability and will continue to have pain in the limb for the remainder of her life. The plaintiff has a life expectancy of 56.5 years. There was some indication in the record that highly specialized forms of surgery might be used to alleviate the plaintiff's pain, but most of the medical experts testifying at trial indicated that the plaintiff's pain would probably be treated through the use of medication for the duration of her life. The record also indicates that the plaintiff has experienced depression which often accompanies chronic pain and she will also be required to undergo treatment for that condition.
A preponderance of the medical evidence reveals that the plaintiff's condition is permanent and that at this point, surgical intervention would be of no benefit and that her discomfort will have to be managed by other means, including medication. The plaintiff presented testimony that she might benefit from treatment at a pain management center and that such treatment could cost as much as $100,000.
In addition, the record shows that the plaintiff is suffering from depression as a result of her chronic pain and has been given an antidepressant drug. The plaintiff presented expert testimony to the effect that she will suffer this depression for the remainder of her life and this condition will require treatment including psychotherapy. The estimated cost for this treatment was $20,000 to $50,000.
The record establishes the probability that the plaintiff will need some form of psychotherapy and medical attention for his physical disability for the remainder of her life. However, the effectiveness of pain management treatments, the amount of psychotherapy necessary, and the total cost for these treatments is difficult to assess. After evaluating all the factors in this record relating to future medical expenses, we find that the lowest award for future medical expenses supportable by the record is $50,000. Accordingly, we amend the trial court judgment to award the plaintiff $50,000 for future medical expenses.

General Damages
General damages are those which cannot be fixed with any degree of pecuniary exactitude but which instead involve mental or physical pain and suffering, inconvenience, loss of gratification or intellectual enjoyment and other losses of life or lifestyle which cannot be measured definitively in terms of money. Boswell v. Roy O. Martin Lumber Company, Inc., *1151 363 So.2d 506 (La.1978); Prothro v. Dillahunty, 488 So.2d 1163 (La.App. 2d Cir. 1986).
Appellate review of awards for general damages is limited to determining whether the trial court abused its great discretion. Adequacy or inadequacy of an award should be determined on the basis of the facts and circumstances peculiar to the case under review, remembering that the trier of fact has the advantage of seeing the witnesses and evaluating their testimony, including testimony concerning residual pain. Boswell v. Roy O. Martin Lumber Company, Inc., supra.
Prior awards are of little value in making this determination. It is only after a determination that an abuse of discretion has occurred that a consideration of prior awards is proper for determining what would be an appropriate award. Reck v. Stevens, 373 So.2d 498 (La.1979); Ward v. Louisiana and Arkansas Railway Company, 451 So.2d 597 (La.App. 2d Cir.1984); Prothro v. Dillahunty, supra.
If the appellate court finds an abuse of discretion, the appellate function is limited to raising inadequate awards to the lowest amount the trial court could reasonably have awarded and lowering excessive awards to the highest amount the court could have reasonably awarded. Burnham v. Frey-Shoemaker-Colbert-Brodnax, 445 So.2d 477 (La.App. 2d Cir.1984).
The plaintiff presented ample evidence that the injury has disrupted her lifestyle. The plaintiff was very active prior to this injury and presented evidence that the chronic pain from this injury prevents her from holding a job and engaging in many of the activities in which she previously participated.
The defendant filed a motion for new trial and at the hearing on the motion attempted to show that the effect of plaintiff's injury was no longer having a serious deleterious effect upon her lifestyle. However, the trial court rejected the evidence put forward by the defendant as being unreliable and denied the motion for new trial. The defendant has not appealed the denial of the motion for new trial.
Based upon the evidence contained in the record we find that the lowest supportable award for general damages is $150,000.

Past Medical Expenses
The plaintiff also alleges that the trial court erred in failing to make an award for past medical expenses. The plaintiff filed into the record a bill from Dr. Gaddis and drug bills for medication necessitated by this injury. Clearly the plaintiff is entitled to recover for past medical expenses related to this injury. The trial court omitted this item of damages from its award. The trial court's award is amended to add this element.
The plaintiff claims past medical expenses totalling $804.87. However, our review of the drug bills submitted by the plaintiff reveals an error in plaintiff's calculation. We award the plaintiff $220 for Dr. Gaddis' bill and $563.43 for drug bills. We have subtracted from the drug bills amounts paid by Medicaid/Welfare. Therefore, we grant the plaintiff a total award of $783.43 in past medical expenses.

LOST EARNING CAPACITY
The trial court awarded the plaintiff $100,000 for "lost past and future wages." The defendant contends this award is excessively high. The plaintiff argues the trial court erred in failing to make an adequate award for lost earnings and future earning capacity. Both arguments are without merit.
In many instances, lost earning capacity and lost future earnings are different elements of damages. Earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Coco v. Winston Industries, Inc., 341 So. 2d 332 (La.1976); Folse v. Fakouri, 371 So.2d 1120 (La.1979); Green v. Farmer's Insurance Company, 412 So.2d 1136 (La. App. 2d Cir. 1982). Such damages are calculated *1152 on the person's ability to earn money rather than on what he actually earned before the injury. Hill v. Sills, 404 So.2d 1323 (La.App. 2d Cir.1981); Cushman v. Fireman's Fund Insurance Company, 401 So.2d 477 (La.App. 2d Cir.1981). The theory is that the injury has deprived the plaintiff of a capacity he would have been entitled to enjoy even though he may never have profited from it. Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied 502 So.2d 114, 117 (La.1987).
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. The courts must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work a hardship upon either party. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir. 1984); Harris v. Pineset, supra.
Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Morgan v. Willis-Knighton Medical Center, supra; Cutchall v. Great American Pump Company, 460 So.2d 1106 (La.App. 2d Cir.1984).
In computing loss of future income, it is first necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury; it is necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience. Morgan v. Willis-Knighton Medical Center, supra.
In the present case, the plaintiff is entitled only to damages for lost earning capacity. The plaintiff had a sporadic employment history prior to her injury. The plaintiff has only a high school education and has previously been employed as a waitress and a file clerk. The plaintiff had been unemployed for approximately two years prior to her injury with the exception of a short time spent working as a waitress early in her pregnancy. Because the plaintiff was not employed at the time of the injury, she cannot claim lost past wages. The plaintiff can only claim lost earning capacity.
The plaintiff presented evidence that she was suited for employment in manufacturing and had she not been injured, she would have sought such employment following the birth of her child. The plaintiff also presented testimony that wages in the manufacturing industry are approximately $8.50 per hour. The plaintiff presented testimony that the present discounted value of $1.00 in wages is $34.26 and that she had a life work expectancy of 24.4 years. The plaintiff also contends that as a result of her injury she was totally unemployable.
The defendant contended that the plaintiff would be able to be employed but would earn close to minimum wage.
Plaintiff's employability and the amount of lost earning capacity suffered are not capable of determination with mathematical certainty. We do not find that the award made by the trial court of $100,000 constituted an abuse of discretion and accordingly we affirm that award.

EXPERT WITNESS FEES
The trial court granted the plaintiff $250 in expert witness fees for each of eleven expert witnesses who testified at trial. The plaintiff contends this award was so low as to constitute an abuse of discretion and argues the amount should be raised to at least $600 per expert.
LSA-R.S. 13:3666 vests the trial court with great discretion to set expert witness fees to be paid by the party cast in judgment. Such an award lies within the discretion of the trial court and will not be altered on appeal absent a showing of an abuse of discretion. Kelley v. Stringer, 422 So.2d 189 (La.App. 2d Cir.1982), writ denied 426 So.2d 177 (La.1983); Whipple v. *1153 Smith, 428 So.2d 1114 (La.App. 1st Cir. 1983), writ denied 433 So.2d 154 (La.1983); Smith v. Travelers Indemnity Company of Rhode Island, 374 So.2d 708 (La.App. 1st Cir.1979); Comeaux v. Dairyland Insurance Company, 399 So.2d 802 (La.App. 3rd Cir.1981); Pike v. Stephens Imports, Inc., 448 So.2d 738 (La.App. 4th Cir.1984).
However, the award of expert witness fees in this case was so low as to constitute an abuse of discretion. Trial of this matter lasted thirteen days, most of which was consumed with expert testimony. Many of the plaintiff's experts spent significant amounts of time in preparation for this trial. Some of the experts traveled long distances and were present and testified on several days of the trial. In light of these factors, we find that the lowest supportable award for expert witness fees in this case is $600 per expert. Upon examining the record and the trial court judgment, we note that the trial court erred in the number and identity of experts for whom expert witness fees were awarded. The trial court judgment excluded Dr. Charles Itzig, who was admitted as an expert and testified on behalf of the plaintiff, and included Dr. Doucet and Dr. Spurlock. Dr. Doucet was admitted as an expert and testified on behalf of the defendant and Dr. Spurlock was called on cross-examination by the plaintiff, but was never offered nor accepted as an expert. Therefore the trial court judgment is amended to award $600 in expert witness fees for the following experts who testified on behalf of the plaintiff: Dr. Samuel F. Burke, Jr., Dr. Kenneth Gaddis, Dr. Richard Galloway, Dr. Charles Itzig, Dr. Richard Flicker, Dr. Jack R. Collins, Dr. Robert Schwendimann, Dr. Terrence M. Clauretie, Dr. Robert Haley and Dr. George McCormick.

CONCLUSION
For the reasons stated above, we affirm that portion of the trial court judgment finding the defendant liable for plaintiff's injury.
We amend that part of the trial court judgment awarding damages to the plaintiff. Accordingly, the judgment in favor of the plaintiff is hereby amended, and recast to read, as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, NANCIE KELLENE HUNT and against the defendant, THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, ET AL, in the amount of ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00) in general damages, FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) in future medical expenses, ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) in lost earning capacity and SEVEN HUNDRED EIGHTY-THREE AND 43/100 DOLLARS ($783.43) in past medical expenses, together with legal interest from the date of judicial demand and all costs of these proceedings and those in the court below.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, NANCIE KELLENE HUNT and against the defendant, THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE, ET AL, for expert witness fees as follows:

Dr. Samuel F. Burke, Jr. $600.00
Dr. Kenneth A. Gaddis $600.00
Dr. Richard Galloway $600.00
Dr. Charles Itzig $600.00
Dr. Richard Flicker $600.00
Dr. Jack R. Collins $600.00
Dr. Robert Schwendimann $600.00
Dr. Terrence M. Clauretie $600.00
Dr. Robert Haley $600.00
Dr. George McCormick $600.00

AFFIRMED IN PART; AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] The defendant contends that the medical records support this theory by showing that the onset of the plaintiff's pain was not immediate and also reveals that her injury was not as serious as she claims. However, the testimony at trial shows that the records were incomplete and sometimes clearly at variance with the facts established by the witnesses.
[2] In support of the defendant's theory that the drug migrated to the nerve site and caused the damage, the defendant cites the case of Mirhosseiny v. Board of Supervisors of LSU, 351 So.2d 1318 (La.App. 1st Cir. 1977), writ denied 353 So.2d 1339 (La. 1978). That case did involve a sciatic nerve injury but is inapposite to the facts of the present case. In Mirhosseiny, there was no allegation or evidence that the injection had been improperly given and the drug injected was not magnesium sulphate.