362 So.2d 1122 (1978)
ELECTRODATA MANUFACTURING CORPORATION
v.
The DOMED STADIUM HOTEL, INC., et al.
No. 9292.
Court of Appeal of Louisiana, Fourth Circuit.
August 18, 1978.
Rehearing Denied October 19, 1978.
Sylvan J. Steinberg, Bronfin, Geller, Feldman & Steinberg, New Orleans, for plaintiff.
Richard C. Baldwin, New Orleans, for defendants.
Before REDMANN, LEMMON and BOUTALL, JJ.
*1123 REDMANN, Judge.
Domed Stadium Hotel, Inc., Rault Petroleum Corporation and Joseph M. Rault, Jr. appeal from a judgment for the bulk of the price of a hotel "room status system" which Domed Stadium Hotel alone contracted for.
There are two major issues. The first is the effect of plaintiff's failure to put defendant Hotel in default in respect to having its building specially wired to receive the system. The second is the effect of plaintiff's selling to another hotel the system components worth $9,758.21 for only $400, without notice to defendant Hotel, several months after bringing this lawsuit.
Why the petition alleged that Rault Petroleum Corporation and Rault individually had contracted for the system is not evident from the record; their being cast in the judgment was presumably the result of a clerical error unnoticed by the trial judge. We reverse as to them for lack of evidence. "Defendant" hereafter refers to Hotel.
As to defendant Hotel, we reduce the judgment from $10,610.10 to $893.38 (the price of orders for electric cable and boxes apart from the system order). We conclude that plaintiff's failure to put defendant in default and plaintiff's resale of the system at an unreasonable price as "junk" without notice to defendant defeats the balance of plaintiff's claim.
The room status system for a 175-room hotel like defendant's consists of 175 interchangeable room units made of brushed stainless steel, one mounted in each room in a standard electrical switch or outlet box connected by wires to two central display panels (front desk and main housekeeping) showing all rooms and one "remote housekeeping" panel showing only the rooms on one floor (there being one such panel for each floor). The system operates by magnetic "keys" used by room cleaners and inspectors which cause flashing or steady lights to display a room's status as uncleaned, being cleaned, cleaned or cleaned and inspected so that both front desk and housekeeping personnel are informed at a glance of a room's availability for renting or of its need of cleaning or inspection. The system also includes a simple card rack for guest registration cards; upon inserting or removing the quest's registration card lights are extinguished or lit to show occupancy of the room.[1]
Plaintiff on December 7, 1973 offered, by a 13-page written "quotation" addressed to defendant, to supply and install such a system for defendant's building, then being repaired after a major fire and being converted from offices and apartments into a hotel at an expense of $3,000,000. Defendant on January 14, 1974 accepted by written purchase order. The contract thus struck did not specify a time for supply and installation, but it did specify terms for payment of the $11,900 price as "net 30 days", contemplating, plaintiff's president testified, that the price was to be paid 30 days after installation.
In respect to time of performance, however, plaintiff's president testified that defendant's "technical coordinator" had ordered the system in November 1973, and had "stressed very strongly" that installation was to be completed by Mardi Gras (February 26) 1974. Although defendant's *1124 president testified that construction progress was such in November that there was "no way" for the building to be ready for February, we may assume that the trial judge believed plaintiff's president.
Plaintiff began making the system on December 12, 1973. Plaintiff's president testified that in early February 1974 they learned that the hotel completion date was "postponed" to May. Plaintiff completed fabrication of the system components in March and on March 29 billed defendant $9,716.72 for manufacture of the system.
Under the written contract, there was no agreement to pay for the equipment before its installation and there was no agreement fixing any amount as a price for the uninstalled equipment. Accordingly, any right plaintiff might have had to collect $9,716.72 (or any other amount) had to arise from some source other than the mere terms of the contract.
The presumable source is defendant's theoretical breach of the contract by not having the building ready for delivery and installation of the system by February (or at least, in view of the written contract's silence on time of performance, by the reasonable time implied by law, La.C.C. 2050 and La.R.S. 10:1-204[2]).
It was reasonable for plaintiff to desire some payment once it learned in February that the hotel would not be ready for the system until May. Plaintiff had invested the bulk of its costs in the manufacture of the system and should not have had to wait indefinitely for its payment when the (oral) bargain was that it should be ready to perform in February. And, although plaintiff was supposed to install before being entitled to payment, the delay in plaintiff's performance was attributable to defendant's delay in readying the building for the installation.
We conclude, nevertheless, that plaintiff was not automatically entitled to its charge for manufacturing the system merely because of defendant's failure to have the building ready for installation at the agreed time (or by a reasonable time). We reason that plaintiff was first obliged to put defendant in default in respect to readying the building.
Plaintiff's obligation to install the system was one subject to a condition, C.C. 2021, the condition being the event of defendant's having the building wired to receive the system. (The contract for the system expressly excluded any obligation upon plaintiff to supply or install the indispensable building wire. Thus that defendant wire the building was an implied condition, implied from the nature of the contract, C.C. 2026.) Certainly plaintiff could not perform unless defendant readied the building (although defendant did not obligee itself towards plaintiff to ready the building, and defendant's readying the building was not causa [the civil analogue of consideration] for plaintiff's obligation to make and install the system). If defendant had obliged itself towards plaintiff to ready the building, readying the building (in addition to being an obligation) would equally remain a condition of plaintiff's obligation to perform. Yet, in that case, plaintiff could not rescind or collect damages unless it put defendant in default; C.C. 1933. That defendant fulfill the condition constituted, however, something akin to an obligation: "Every condition must be performed in the manner that it is probable that the parties wished and intended that it should be." C.C. 2037. Consider also, at least by analogy, that it is an "obligation" of a buyer to receive delivery, C.C. 2549: and a buyer "who neglects to obtain delivery of the thing sold, after having been put in default, is answerable [for damages]", C.C. 2555 (emphasis added).
We conclude that, ordinarily, when a suspensive condition of an obligation is an event to be accomplished by the obligee, delay in fulfilling the condition does not entitle the obligor to damages (or *1125 to rescission) unless the obligee has first been put in default with respect to the fulfillment of the condition. The putting in default may be accomplished by any of the means specified in C.C. 1911 (made applicable by C.C. 1933 as well to obligations to do as to obligations to give). Putting in default is not necessary when the act to be done is "of such a nature that it could only be given or done within a certain time, which has elapsed, or under certain circumstances, which no longer exist . . .", C.C. 1933. Putting in default may occur by the mere failure to perform, but only where the contract terms so provide; otherwise (with specific exceptions by law) the party must demand performance by suit[3], written demand, notarial protest, or oral demand in the presence of two witnesses, C.C. 1911. (Moreover, the obligee's delay in fulfilling the condition will excuse the obligor's delay in performing the obligation, and it may justify the obligor's refusal to perform when unreasonable time has increased costs or otherwise occasioned a change in the obligor's position. But it does not discharge the obligation as if it were the equivalent of performance; i. e., it does not both excuse ultimate performance and oblige the obligee to pay for a performance he will not get.)
Neither the terms of the contract nor any act by plaintiff put defendant in default in respect to readying the building. Plaintiff's agents did inquire as to the building's readiness when they telephoned (from Florida) to inquire about payment of their bill on many occasions. But they never wrote to demand that the building be readied, and no one ever came to Louisiana.
When May 1974 arrived, plaintiff learned completion was postponed until July. Thereafter postponement was monthly until September, at the end of which plaintiff's president gave the "account" to plaintiff's accountant to collect. (At this time, plaintiff also finally quit the business of room status systems, for lack of sales.) Thereafter frequent, almost daily, telephone calls were made in an effort to obtain payment from defendant. Towards the end of November, plaintiff (whose office is in Florida) had its Florida lawyers write a letter of demand for payment. (We repeat our view that, in the absence of a putting in default, plaintiff was not legally entitled to disregard the contract and insist on being paid for the system prior to installation.)
Apparently nothing more occurred until January 14, 1975, when defendant's employee Mrs. Fort telephoned plaintiff's accountant to request delivery and installation of the system. Also, the accountant testified, Mrs. Fort at first said she would send a check in payment of plaintiff's invoices, but on January 15 she said that the check would be given to the installation crew on its arrival. The accountant then conferred with plaintiff's officer Jacobson (himself a Florida lawyer), who thereafter handled the matter. Jacobson "became rather apprehensive about our situation", especially because he envisioned a $2,800 increase in the $2,183.28 installation labor cost. He telephoned Mrs. Fort on January 16 and asked her to have defendant pay that additional $2,800, or at least half of it; but, Mrs. Fort told Jacobson, defendant's president "was adamant; he wasn't going to pay anything toward" the $2,800. (Mrs. Fort also told Jacobson that the building was ready and that plaintiff wanted the system installed "as a matter of urgency . . . they were opening up and had to have something right away.") Jacobson told Mrs. Fort plaintiff would complete the contract at the contract price, but wanted written confirmation that the building was ready, that lodging would be provided for the installation crew, and that a check for $10,610.10 would be given to the crew on its arrival. On January 24 Jacobson wrote to Mrs. Fort that plaintiff would not send the crew until those assurances were made in writing.
Defendant's president instructed Mrs. Fort not to send such a letter because, he testified, of the contract's provision for payment after installation.
*1126 When the written assurances did not arrive by January 31, plaintiff concluded that defendant would not pay for the system and installation. Plaintiff thereupon wrote defendant, expressing the conclusion that defendant was dishonoring the contract and notifying defendant it would be sued.
Meanwhile, in January, defendant opened its hotel, under a management agreement executed in December 1974 with a national hotel chain. (Although plaintiff argues that this agreement precluded use of plaintiff's system and shows defendant's bad faith, this argument is not supported by the agreement or by any other evidence. In mid-January Mrs. Fort told Jacobson of the national chain connection in the same telephone call that she made to request delivery and installation of plaintiff's system.) Instead of the $11,900 electrical room status system, defendant used a $200 card rack, situated at the front desk, which showed only occupancy and neither relayed information to nor received it from housekeeping personnel.
Suit was brought in July 1975, alleging only the sale of a custom-made system to defendant(s) at a price of which part had been paid and $10,610.10 remained due, and further alleging a willingness to "deliver" the system to defendant. (Alternatively recovery was sought in "quantum meruit".)
Because plaintiff was no longer in business (though it remained a legal entity), the system had been stored (at no cost) in the building of a related corporation. In April 1976, nine months after this suit was filed, plaintiff sold to another hotel as "junk" for $400 the system it refused to deliver to defendant except on payment of $10,000.
Plaintiff's argument that it was mitigating its damages by this $400 sale seems to be an afterthought, an attempt at rationalization. The theory of a "duty to mitigate" is merely that avoidable consequences of a breach are not recoverable (see Restatement, Contracts § 45 Comment d; Williston, Contracts, 3d ed. § 1353); one breaching a contract owes only the damages "which the other party has sustained by his default [i. e., breach]", La.C.C. 1930.
The room status system was not junk (see n. 1 and text above) but would have been to a substantial extent usable by any supplier of such systems (though plaintiff had quit that business a year and a half earlier). The system had even greater value to defendant. The $400 sale was not a reasonable act (not "commercially reasonable", as, in other jurisdictions, U.C.C. § 2-706 requires).
Nor does the mitigation argument jibe with plaintiff's vice-president's answer to the question what efforts were made to sell the system:
Only one, which really wasn't an effort on our part . . . we didn't go out and try to find a buyer . . . it [was] totally impractical. But when this particular person called about spare parts, we suggested we could send him a system we had built for another motel and that was of no value to us, and he could, consequently, strip out the parts and use them as needed. [Emphasis added.]
Although we need not decide whether the contract for the system was a sale (see Litvinoff, Obligations, II § 158), La.C.C. 2555 and 2556 are applicable at least by analogy:
The purchaser, who neglects to obtain delivery of the thing sold, after having been put in default, is answerable to the vendor for the damage which he may sustain on that account, and for the reimbursement of the expense which may have been incurred for the preservation of the thing.
The seller may even obtain authority, where movables have been sold, and the custody of them is inconvenient to him, for putting them out of his house at the risk of the purchaser, on giving him notice of the day and hour at which he will put them out.
Had plaintiff put defendant in default in respect to the condition of readying the building, plaintiff still had no right to sell the $10,000 system as junk for 4% of its cost without giving prior notice to defendant. *1127 (compare U.C.C. § 2-706(3), requiring "reasonable notification" to the buyer of seller's intention to resell at private sale.)
Whether an unreasonable resale without reasonable notice is necessarily fatal to every claim for damages (including, for example, one for lost profits rather than for full price less recovery from resale) we need not decide. Were plaintiff still able to put defendant in default it might yet do so (though unreasonable delay to put in default itself would pose a problem). But plaintiff is no longer able to put defendant in default (disregarding that defendant has long since fulfilled the condition); plaintiff has sold the last room status system it had and consequently is no longer able to tender its own performance under the contract as C.C. 1913 requires for a putting in default. Plaintiff therefore could not recover any measure of damages that might theoretically survive the unreasonable resale without notice.
Under all the circumstances we conclude that plaintiff is not entitled to recover its charges for manufacturing the system or any other measure of damages. We reduce its award to the charges for electrical cable and boxes which presumably retain their value for use with some other system or for some other purpose.
The judgment appealed from is reversed as to Rault Petroleum Corporation and Joseph M. Rault, Jr. at plaintiff's cost and amended in principal to $893.38 as to Domed Stadium Hotel, Inc., with costs to be divided equally between plaintiff and Hotel.
LEMMON, Judge, concurs and assigns reasons.
When an obligor fails to perform an obligation to do, a putting in default is necessary to determine the starting point for damages, because the law presumes that the obligee's failure to put in default is a tacit extension of the obligor's time for performance. Litvinoff, 7 Louisiana Civil Law Treatise Obligations, § 175 (1975). The putting in default does not require any special formality or language, as long as the purpose is served to notify the obligor that the promised performance is due and that any delay is detrimental to the obligee's interest.
Plaintiff's letter of November 27, 1974, demanding payment for the cost of manufacturing the system because installation was delayed on account of defendant's failure to have the building ready, implicitly demanded performance of defendant's obligation to ready the building and notified defendant that plaintiff intended to hold defendant responsible for the consequences of its failure to perform. That letter, therefore, constituted a putting in default which would entitle plaintiff to collect, as damages caused by defendant's breach, the cost of the manufactured system prior to installation and the amount of any increase in installation labor cost after the putting in default.
However, whether or not defendant was put in default for failing to ready the building became relatively unimportant when the building eventually was ready for installation. When defendant thereafter refused to accept installation except under the terms of the original contract, plaintiff could have demanded either compliance or damages in the amount it had spent to produce the system (in which case defendant would have been entitled to ownership of the equipment). But when plaintiff made compliance impossible on any terms by "selling" the equipment without notifying defendant, the willful wasting of the equipment relieved defendant of any obligation of payment therefor. Plaintiff, although wronged, has left itself without a remedy.
NOTES
[1] Plaintiff describes the system as custom-made for each hotel, of no value to any other hotel unless it had the same number of rooms with the same room numeration on each floor. Plaintiff's officers testified, however, that the 175 room units were all identical and therefore usable in any other hotel. Shop documents and drawings show that the system is made from standard parts modified and accommodated to the particular hotel; e. g., the seven-column front desk panel uses seven standard 35-room panels, with appropriate blank spaces (left by deleting "punch commands") to reduce the possible total of 245 rooms to the 175 needed. Fully custom-made, and not practically usable elsewhere except in a hotel with virtually identical room numeration, where specially ordered "Black Phenolic Numbering Strips . . . per attached numbering list, with white numerals, with beveled edges, with double-sided adhesive on back." However, these adhesive-backed plastic numbering strips could presumably be replaced with new strips with other numeration, thus making front desk and main housekeeping panels also usable in another 175-room or smaller hotel, and remote housekeeping panels usable on other hotel floors with equal or smaller numbers of rooms.
[2] The reasonable time must be measured in relation to "the nature . . . and circumstances" of the act to be performed, R.S. 10:1-204(2). Both plaintiff's manufacture and installation and defendant's wiring of its 175 rooms to receive the installation reasonably required an amount of time that may or may not have extended beyond February.
[3] The present suit did not demand performance of the condition of readying the building; it only demanded payment. Moreover, the building was ready before this suit was filed.