620 So.2d 1354 (1993)
Shirley V. COFFIN, et vir., Plaintiffs-Appellees,
v.
The BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE, et al., Defendants-Appellants.
No. 24911-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*1357 Booth, Lockard, Politz, Lesage & D'Anna by Bennett L. Politz, Shreveport, for defendants-appellants.
Edmund M. Thomas, Shreveport, James Don Thomas, II by Benjamin P. Mouton, Baton Rouge, for plaintiffs-appellees.
Before MARVIN, LINDSAY and STEWART, JJ.
STEWART, Judge.
Shirley V. Coffin and her husband, Alford Coffin, filed a medical malpractice suit against defendants, the Board of Supervisors of Louisiana State University Agricultural and Mechanical College, et al. The trial court rendered judgment in favor of plaintiffs and awarded a total of $180,000 for general damages and a total of $171,819 for special damages. Defendants appeal, asserting that plaintiffs failed to prove the element of causation and that the damage awards were excessive and/or unsupported by the record. Plaintiffs answer the appeal, asserting that an item of the general damage award was inadequate and should be increased from $25,000 to $100,000.

FACTS
Shirley Coffin was a switchboard operator at LSUMC. On July 27, 1984, a panendoscopy was performed on her at Louisiana State University Medical Center (LSUMC) by Dr. John Tate, a board certified physician in otolaryngology (ear, nose and throat), and Dr. Sam Anthony, a second year resident. A panendoscopy is a diagnostic procedure in which the physician views the inside of a hollow organ or cavity with several devices which consist of a tube and optical system. In this panendoscopy, the physicians used various endoscopes designed to pass through Coffin's trachea (bronchoscope), esophagus (esophagoscope), and vocal chords (laryngoscope), in order to view her bronchi, esophagus, and larynx, respectively. She was told that this would be a simple diagnostic procedure which would basically be done as "day surgery".
Dr. Sam Anthony began at least two of the three procedures but, after his attempts to insert the bronchoscope and esophagoscope were unsuccessful, Dr. John Tate successfully inserted the endoscopes. When Dr. Tate examined Coffin with the esophagoscope, he observed a tear of her right piriform sinus. This sinus is a pearshaped canal located on either side of her throat, slightly above the larynx and trachea. The physicians immediately terminated the panendoscopy and Coffin was prepped for emergency exploratory neck surgery to drain and repair the damaged area. When Coffin awoke, she had a 3½ inch incision in the right side of her neck, with several drains sticking out of the incision site. She received nourishment via a feeding tube, and remained in LSUMC for an additional seventeen days.
Coffin was discharged on August 13, 1984. She returned to work as a switchboard operator on August 25, 1984, but resigned on September 23, 1984 due to both employment and health problems. She continued medical treatment for hoarseness, difficulty in swallowing, and pain. Dr. James R. Robinson, a board certified otolaryngologist, was Coffin's treating physician, beginning September 28, 1984. Dr. Robinson instructed her to stop smoking, but she did not. Robinson treated her until May 3, 1988. He surgically stripped her vocal cords on November 5, 1984 and again on December 23, 1985 due to leukoplakia, a pre-cancerous condition in which white patches appear on the vocal cords.
The Coffins sued the Board of Supervisors of Louisiana State University Agricultural and Mechanical College, Louisiana *1358 State University Medical Center at Shreveport, Dr. Sam O. Anthony, Dr. John Tate, and other LSUMC employees who cared for her during her seventeen day hospitalization. They asserted that defendants were negligent in allowing an untrained physician to perform a procedure above his level of skill and that this negligence resulted in the tear of her right piriform sinus. The trial court granted plaintiffs' motion for summary judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Petitioners, SHIRLEY V. COFFIN and ALFORD COFFIN, and against the Defendant, THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, on the issue of liability for all damages to be proven at trial of this matter.
The issues of causation and damages proceeded to trial. The summary judgment is not challenged herein.
After trial on the issues of causation and damages, the trial court found that the July 27, 1984 panendoscopy caused permanent injury to Coffin by diminishing her quality of life and employability. The trial court awarded a total of $351,819 in damages plus interest and costs. Defendants appeal, asserting that the trial court erred in finding that this surgical procedure, rather than smoking, caused Coffin's permanent injury. In the alternative, defendants assert that the trial court erred in awarding excessive general damages. We disagree with defendants about the trial court's determination of causation, but we agree in part regarding the general damages. Plaintiffs answer to the appeal, seeking an increase in general damages for Coffin's 17 day hospital stay, is denied.

DISCUSSION

Causation
Defendant-appellants assert that the issue before this court is whether LSUMC's admitted negligence, during the July 1984 panendoscopy, caused Coffin's chronic hoarseness. Appellants also contend that the tear of the piriform sinus is not the cause of Coffin's chronic hoarseness.
In a medical malpractice action, the plaintiff must establish by a preponderance of the evidence: (1) that the doctor's treatment fell below the ordinary standard of care expected of a physician in his medical specialty, and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991). At issue before the trial court was the existence of a causal relationship between the negligent medical treatment of Coffin and the injuries which she sustained, and the quantum of damages for such injuries.[1]
A medical malpractice plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant's conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant's conduct. Maxwell v. Soileau, 561 So.2d 1378, 1387 (La.App. 2d Cir.1990), writ denied, 567 So.2d 1123 and 567 So.2d 1124 (La.1990).
Whether there exists a causal relationship, between the alleged negligent treatment and the injury sustained, is a determination of fact which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991). In Stobart v. State DOTD, 617 So.2d 880 (La.1993), the Louisiana Supreme Court observed that
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless *1359 it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly, wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.
(Citations omitted and emphasis ours.)
The difficulty in analysis of the instant case arises from the myriad of possible causes for Coffin's physical and mental damage. At the time of trial, Coffin had smoked for approximately 24 years. She smoked between one and two packages of cigarettes per day. She was hoarse prior to the panendoscopy. A few months after the panendoscopy she was diagnosed as having leukoplakia, white patches, on her vocal cords and had two subsequent surgical procedures in which the mucous membrane of the vocal cords was "stripped" in order to remove the leukoplakia. Although leukoplakia was consistently referred to in the record as "a precancerous condition", Coffin's tests revealed no malignancy.
According to the record, smoking causes leukoplakia. Defendants contend that Coffin's leukoplakia was caused by her smoking and that the leukoplakia, and/or the procedures which stripped her vocal cords, caused her voice problems. No medical expert explained at trial, to a medical certainty, the specific origin of Coffin's hoarseness, periodic loss of voice, and/or the adverse change in the quality of her voice.
Dr. James R. Robinson testified as plaintiffs' expert in otolaryngology (ear, nose and throat). Dr. Robinson had been Coffin's treating physician for about four years after the July 1984 surgery. On cross-examination, he responded as follows to defense counsel's question:
Q What do you equate her hoarseness to?
A I think that something happened to her during that procedure that has resulted in a permanent change in her voice. The leukoplakia didn't do it. I don't think the tear in the pyriform sinus did it. Apparently there were repeated attempts to insert the bronchoscope and it's possible that the doctor could have momentarily or partially dislocated one of the little cartilages that are connected to the vocal cords. It's possible he could have injured one of the nerves that innervates the vocal cords, all sorts of things may have happened to the vocal cords as he was trying to intubate her on one occasion and insert the bronchoscope on another occasion.
Dr. Robinson explained the relationship between Coffin's hoarseness and leukoplakia as follows:
A I think you asked me if her hoarseness was due to the leukoplakia and I believe that she had hoarseness due to the leukoplakia. The question has been whether or not her hoarseness was made worse because of difficulties the physicians had at L.S.U. I have seen a number of patients with leukoplakia and none of them have had hoarseness like hers. The problems that the physician had instrumenting her voice box I think could have caused an injury to the voice box that made her hoarseness worse apart from the problem with the leukoplakia.
Q But leukoplakia was a component in her hoarseness problem?

*1360 A Yes, sir.
Although his opinion was that Coffin's smoking and leukoplakia caused the damage to her voice, Dr. John Tate, defendant and defense expert witness in otolaryngology, testified on cross-examination as follows:
Q. It is possible, is it not, that Dr. Anthony caused damage to the vocal cords by trauma?
A. It's possible.
. . . .
A. He was unable to put the tube through, or he was unable to see the cords.
Q. All right. That procedure also could result in damage to the vocal cords, could it not?
A. It could.
Dr. Tate also testified that the two main nerves, the superior laryngeal and the recurrent laryngeal, that go to the larynx (voice box) can be injured by stretching, pressure, and/or trauma. During his attempt to repair the tear in the pyriform sinus, he had to retract the voice box:
Q. So, you were having to retract her voice box?
A. Slightly, yes.
Q. And when you retract the voice box, that indirectly retracts both the superior laryngeal and the recurrent laryngeal, does it not?
A. Slightly.
Q. So those nerves, their course was altered at least by some pressure during this procedure?
A. Perhaps.
Q. And you decided not to pursue the attempt at closure or to locate the hole in a risk/benefit analysis, in that the risk of injury to the vocal cords or voice box or surrounding tissues or structure might outweigh any benefit therefrom?
A. Yes.
Dr. Tate noticed an adverse change in the quality of Coffin's voice after this procedure, but could not evaluate the extent of this change because he saw her only once, less than one week after she left the hospital. In summary, Dr. Tate explained his view of Coffin's inability to perform as a telephone operator after this surgical procedure as follows:
It could be a combination of things. It could be a combination of her surgery and smoking. Some swelling from her surgery which she obviously is going to have some swelling, put her over the edge. Kind of like taking a musical instrument a little bit out of tune, and after that, I can't imagine because I didn't see her.
While Dr. Tate did not continue treating Coffin during the months and years after this surgery, Dr. Robinson did. Dr. Robinson and Coffin's daughter, Lori Kahle, both testified that there was no adverse change in Coffin's voice after either the first or second "stripping" of her vocal cords. Several laywitnesses, Coffin's family and friends, testified that they were familiar with her voice before and after the panendoscopy and that her voice was never the same after this July 1984 surgery.
The trial court concluded that defendants' negligent procedures caused three distinct injuries: (1) tear of the right piriform sinus, (2) creation of the fistula tract into the mediastinum, and (3) trauma to the vocal cords and on the voice box (larynx). The trial court also concluded that Coffin's voice is severely and permanently damaged. Specifically, the trial court found that Coffin's "vocal cords and voice box were severely traumatized by Dr. Anthony's negligence in the ramming of both the bronchoscope and endotracheal tube down Mrs. Coffin's throat."
Inherent in the trial court's judgment for plaintiff is an assessment of the credibility of the witnesses. After careful review of the trial record we conclude that the trial court was faced with several permissible views of the evidence regarding the causation of Coffin's permanent injuries. Though our appellate evaluations and inferences drawn from the evidence may have differed from the trial court's, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. Rosell, supra. Therefore, under Stobart and *1361 Mart, both supra, we cannot say that the trial court's determination of a causal relationship, between the July 1984 surgery and the damage to Coffin's voice, is clearly wrong. For these reasons, we find no reversible error.

General Damages
The $351,819 awarded to plaintiffs includes $165,000 in general damages. These damages are detailed as follows:

 LSUMC Hospital Stay $ 25,000
 Permanent damage to voice, past and present loss of quality of
 life due to diminished voice quality $ 50,000
 Past and present mental anguish, emotional suffering and depression $ 50,000
 Predisposition to and fear of cancer $ 15,000
 Loss of consortium $ 15,000
 Future Medical expenses $ 10,000
 _________
 Total General Damages: $165,000

General damages are those which cannot be fixed with any degree of pecuniary exactitude but which instead involve mental or physical pain and suffering, inconvenience, loss of gratification or intellectual enjoyment and other losses of life or lifestyle which cannot be measured definitively in terms of money. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144, 1150 (La. App. 2d Cir.1988).
When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. LSA-C.C. art. 1999. In reviewing the amount of an award of damages, the appellate court's function is to determine whether this great discretion has been abused, and not whether the amount of the award is manifestly erroneous or clearly wrong. See Ramphrey v. Highlands Ins. Co., 406 So.2d 691, 693 (La.App. 2d Cir.1981) [discussing LSA-C.C. Art. 1934(3), upon which the current LSA-C.C. Art. 1999 is based]. See also, Hunt, supra at 1151.
If the appellate court finds an abuse of discretion, the appellate function is limited to raising inadequate awards to the lowest amount the trial court could reasonably have awarded and lowering excessive awards to the highest amount the court could have reasonably awarded. Hunt, supra at 1151.
The appropriate procedure for testing whether the trial court abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the factfinder. Bailes v. U.S. Fidelity and Guaranty Co., 512 So.2d 633, 643 (La.App. 2d Cir.1987).
Appellants contend that their responsibility for damages only relates to the tear in the piriform sinus and Coffin's resultant seventeen day hospitalization. In the alternative, appellants contend that, other than the amount awarded for the hospital stay, the trial court's general damage awards are excessive and/or unsupported by the record. Accepting the trial court determination that trauma to the vocal cords and voice box resulted in permanent damage to her voice, we agree with the trial court that appellants' responsibility extends beyond that of the tear, alone. *1362 Accordingly, we examine the components of the general damage award for excessiveness.

LSUMC Hospital Stay.
Appellants do not challenge the $25,000 award for the hospital stay. However, in their answer to the appeal, the Coffins assert that this award is inadequate and request that this court amend the judgment to increase this award from $25,000 to $100,000.
Having reviewed the record, we agree with appellees that the seventeen day hospital stay was unexpected and traumatic. However, we find no abuse of the trial court's discretion in awarding $25,000 for the hospital stay. Appellees' request is denied.
Permanent Damage to voice, past and present; loss of quality of life due to diminished voice capacity.
Appellants' argument regarding this award is as follows:
This award duplicates special damages in the form of past lost wages and lost earning capacity. Loss of quality of life for Shirley Coffin is her alleged inability to work (i.e. independence) as a PBX operator, a job she apparently loved. If permanent damage to her voice manifests itself in a significant tangible way, it is in her alleged unemployability, which is covered in a special damage award for lost wages and lost earning capacity.
The evidence at trial indicates that Coffin enjoyed her work as an operator. However, we disagree that this award duplicates the special damage awards based on the evidence of record.
Several witnesses testified that Coffin's voice has not been the same since Dr. Anthony and Dr. Tate performed the panendoscopy. The resultant change in her voice was described as gravelly, abnormal, severely hoarse. On occasion, Coffin opens her mouth to say something and no voice comes out, or she begins talking or singing and her voice leaves. The trial court found that there had been permanent damage to Coffin's vocal cords and voice box. As discussed above regarding the issue of causation, this finding is not clearly wrong. There is no bar to Coffin's ability to recover damages, in addition to economic loss, for the physical damage to her vocal cords and larynx (voice box) or for the loss in her quality of life. Appellants' argument has no merit.
The evidence of damage to Coffin's voice and quality of life since the July 1984 surgery, as well as at the time of trial almost eight years later, reveals no abuse of the trial court's discretion in this $50,000 award.

Loss of Consortium
Appellants argue that the record contains no basis for the trial court's generous award of $15,000 to each spouse for loss of consortium. We disagree.
Loss of consortium contemplates something more than a loss of general overall happiness, but includes seven components: love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991), writ denied, 588 So.2d 1119 (La.1991); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
Although the record is sparse on this topic, it reflects that Alford Coffin and his wife had both worked for a number of years. His wife, had been an outgoing person who, after the panendoscopy, became withdrawn and depressed. Her voice was no longer "soothing". They did not spend time together doing things they had done prior to the surgery. Because she no longer worked, their marriage also suffered due to the strain of finances: they lived with and were generally supported by one of their children. Alford Coffin, Shirley Coffin, and their daughter, Lori Kahle, each testified that the Coffin's marital relationship was strained as to several of the components of loss of consortium. We find no abuse of the trial court's discretion in this award. See and compare Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870, 879-880 (La.App. 2d Cir.1992), writ denied, *1363 596 So.2d 210 (La.1992); Bolton v. Nagalla, 609 So.2d 1134 (La.App. 2d Cir.1992). Mental Anguish and Future Medical Expenses
We now turn to discuss the remaining three general damage awards which, in our opinion, are clearly related. The trial court awarded $50,000 for mental anguish, $15,000 for predisposition to and fear of cancer, and $10,000 for future medical expenses. For the following reasons, we find that these three awards, which total $75,000, are an abuse of discretion.

1. Predisposition to and fear of cancer.
The trial court found that "the fistula tract exists because of the botched surgery performed in 1984 and that Mrs. Coffin is at an increased risk for cancer." Although we do not disturb the finding that the fistula tract exists, we find this award to be manifestly erroneous for the following reasons.
There was no testimony by an expert in either oncology or psychiatry. The only witness who links the break, or discontinuity, in the surface tissues of the esophagus, i.e., the fistula tract, to a predisposition of cancer is Dr. Robinson, an otolaryngologist. His testimony on this topic is as follows (emphasis ours):
Q Now you indicated that wherever there is a break in the epithelium of the esophagus is that what you said, the surface tissues of the esophagus?
A Yes, sir.
Qthat if there's a break in the epithelium that causes friction which may cause or predispose one to cancer?
A It causestypically it should cause an irritative reaction of some sort. It's well known that cancer is more likely to develop any time there is a long-standing irritative reaction to any part of the body.
Q Do you feel that she is at any increased risk of cancer as a result of the perforation of her pyriform sinus and the subsequent forming of a tract between her mediastinum and her esophagus?
A I really don't know, I've not ever been able to find anything in our literature that describes a similar complication. I have no idea. I do think it's important that she have continuity of care by physicians who are able to evaluate this aspect and are specialists in this field indefinitely.
Q So you feel thatI believe you indicated you didn't know but I get a different feeling from your words are you saying that based on your basic medical understanding that she would be at an increased risk but you have never seen any material which so verifies that?
A That's correct.
Q So based on your basic medical knowledge of cancer and of tissues it would seem to cause her to be at increased risk?
A I think that's reasonable.
This testimony is speculative at best, and does not give rise to two permissible views of the evidence. Neither expert witness, nor any other witness, opined that Shirley Coffin was predisposed to, or developed a phobia of, cancer because of the delict admittedly caused by defendants. While we concede that there is much testimony about the existence of the fistula tract, there is no testimony which makes a more probable than not connection between the delict for which the instant tortfeasors are responsible and any predisposition to cancer or phobia of cancer. Having carefully reviewed the trial court's reasons for judgment, we note that its finding of this causal relationship is conclusory only and does not point to any specific evidence upon which this conclusion is based.
Having reviewed this issue under the appellate review standards of Rosell v. ESCO, 549 So.2d 840 (La.1989) and Stobart v. State DOTD, supra, the conclusion is inescapable that there are no two permissible views of the evidence on this point. The only conclusion that can be reached on this record is that plaintiffs did not preponderate in establishing (1) the existence of a predisposition to or phobia of cancer, or (2) a causal relationship between the creation *1364 of the fistula tract and any predisposition to or fear of cancer which might exist. Absent a permissible view of the evidence that supports the trial court's conclusion, we find that it is clearly wrong, manifestly erroneous, in awarding this $15,000 item of damages.
Moreover, we note that cancerphobia is merely a specific type of mental anguish or emotional distress. Hagerty v. L & L Marine Services, Inc., 788 F.2d 315, 318 (5th Cir.1986). We have found no authority which supports this "fear of cancer" award in addition to, yet separate from, an award for mental anguish, emotional suffering, etc.

2. Future Medical Expenses
An award for future medical expenses by nature is not susceptible of mathematical certainty. Like any other element of special damages, however, future medical cost or expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures more probably than not will be incurred. Thomas v. Petrolane Gas Service, Ltd., 588 So.2d 711 (La.App. 2d Cir. 1991), writ denied, 590 So.2d 1201 (La.1992) (citation omitted); Durkee, infra. The burden of proof in a claim for future medical expenses is a preponderance of evidence. Durkee v. City of Shreveport, 587 So.2d 722, 730 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991). Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that the expenses are indicated and setting out their probable cost. Durkee and Hunt, both supra (citations omitted).
As quoted above regarding Coffin's risk of developing cancer, the testimony of Dr. Robinson indicated that Coffin should have indefinite "continuity of care by physicians who are able to evaluate this aspect and are specialists in this field ..." Dr. Robinson also testified that if Mrs. Coffin continues to smoke she is at risk for the development of cancer of the larynx.
There is no testimony or other evidence that recommends future medical treatment that is required because of either the fistula tract or damage to Coffin's vocal cords and voice box. There is testimony that leukoplakia, caused by smoking, may require future treatment. There is evidence that Coffin's smoking, alone, increases her risk of getting cancer. There is testimony that the fistula tract may, via irritation, develop a malignant deterioration. However, the record is unclear as to recommendations for future medical treatment and what, if any, future treatment is required due to defendants' negligence, and not due to Coffin's continued smoking. For these reasons, we find that the trial court abused its discretion in awarding $10,000 for future medical expenses.

3. Past and present mental anguish, emotional suffering and depression.
The trial court awarded Coffin $50,000, noting in its reasons for judgment trial testimony that she has become withdrawn, has contemplated suicide, and is no longer the strong-willed independent and active person she once was. Coffin described the frustration of being unable to communicate effectively. Her family and friends described how her personality and activities changed from those of an outgoing person to one who is depressed and unfulfilled. Part of Coffin's mental anguish arose from the hospital stay, for which Coffin was awarded $25,000 in damages.
It is uncontradicted that Coffin's demeanor and mental state have been affected by the injury to her vocal cords and voice box. However, no conclusion can be drawn from this record as to whether this situation is temporary, permanent, susceptible to change if she were to modify her behavior or lifestyle, and/or whether there is therapy available which may alter her depressed or withdrawn state. Given the absence of proof beyond that discussed above, we deem this award to be an abuse of discretion.

4. Summary
As detailed above, there is no indication of whether Coffin's mental state is temporary *1365 or permanent. Likewise, there is only speculation about her predisposition to, or fear of, cancer. Furthermore, there is no evidence of the specific future medical care required or the cost thereof. Based upon the evidence presented at trial, we find that these three awards, which total $75,000, constitute an abuse of discretion.
We reduce the total of these related awards from $75,000 to $10,000, which is the highest of the range of just and fair reparation which we would affirm for Coffin's mental anxiety, past and future, arising out of her injuries, including periodic monitoring of the fistula tract. These awards, in our opinion, stem from the same source and are related.

Special Damages
The remainder of the $351,819 awarded to plaintiffs is $171,819 in special damages, detailed as follows:

Special Damages:
A) Past Lost Wages $ 90,507
B) Loss of earning capacity $ 81,312
 ________
 Total Special Damages $171,819

In brief, appellants request that this court examine all damage awards for excessiveness.

Past lost wages.
Dr. Terrence M. Clauretie testified by deposition and was accepted by both parties as an expert in finance and economics. He testified that, based upon Coffin's preinjury wages and his assumptions regarding cost of living salary increases, Coffin's past lost wages are $78,702 after subtracting the amount she actually earned after the injury. This amount does not include fringe benefits, which Dr. Clauretie estimated at 15 per cent of wages, or $11,805. The trial court added these two figures for a total award of $90,507 in past lost wages. The record supports this award.

Lost Earning Capacity.
Loss of earning capacity is compensable, just as loss of actual earnings. Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064, 1071 (La.App. 1st Cir. 1983), writs denied, 433 So.2d 1056 and 433 So.2d 1057 (La.1983). In many instances, lost earning capacity and lost future earnings are different elements of damages. Hunt, supra, 522 So.2d at 1151. In determining the loss of earning capacity, we look to the disabled person's capacity to do that which he may be actually or potentially reasonably qualified by nature, training and experience, and for which he may receive recompense. Walker v. Bankston, 571 So.2d 690, 696 (La.App. 2d Cir.1990).
An award for impairment of earning capacity is not predicated merely upon the difference in a plaintiff's earnings before and after injuries but instead, on the earning capacity of the plaintiff before and after the injury. These awards thus encompass the loss of plaintiff's earning potentialthe loss of plaintiff's ability to do that for which she is equipped by nature, training and experience. Burke v. Safeway Stores, Inc., 554 So.2d 184, 190 (La. App. 2d Cir.1989).
Because lost earning capacity cannot be calculated with mathematical certainty, the trier of fact is afforded much discretion in the determination of such damages. Walker, Bailes, Burke, all and Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writ denied, 502 So.2d 114 (La.1987). Because of the speculative nature of these awards, the trial court must exercise sound judicial discretion in determining these awards and render these awards consistent with the record and which do not work an injustice on either party. Burke, supra.
The record supports the trial court's conclusion that, as a result of the July 1984 surgical procedure, Coffin is disabled *1366 to returning to the vocation in which she has training and experience. There is evidence that she can no longer function as a telephone or switchboard operator, receptionist, or in other occupations which require frequent oral communication.
Dr. Richard H. Galloway testified by deposition and was accepted by both parties as an expert in vocational rehabilitation. According to Dr. Galloway, Coffin is able to perform light and/or sedentary work activity for which she would be paid an amount at or near minimum wage. In his opinion, it would be difficult for Coffin to find employment in a competitive job market due to both her unpleasant voice and her age.
Dr. Clauretie calculated that Coffin's work life expectancy at age 55.3 years of age is 6.75 years. If Coffin were unable to find employment, the present value of future income from her former occupation, over the next 6.75 years, is $86,339 using a discount rate of approximately 6.8 percent. If there is no adjustment for the past, the present value of the future loss is $122,679, rather than $86,339. If she were to work at $4.50 per hour, the lost future wages are $29,570. (See Clauretie deposition, pages 6-7, 9). He stated that 15 per cent of wages is a conservative estimate of the value of fringe benefits. Thus, he estimated fringe benefits of $12,950 in addition to the $86,339 and $18,402 in addition to the $122,679. (See Clauretie deposition, pages 11, 14-15)
The record contains sufficient evidence to support the trial court award for loss of earning capacity.

Mitigation
Appellants request a reduction in damages due to Coffin's failure to mitigate damages. They assert that she failed to follow medical advice that she curtail her tobacco use.
The Louisiana Supreme Court discussed the relationship between the responsibility of a tortfeasor and a victim as follows in Aisole v. Dean, 574 So.2d 1248 (La.1991):
It is a well-established principle of law that a tortfeasor takes his victim as he finds him and although the damages caused are greater because of the victims' prior condition which is aggravated by the tort, the tortfeasor is nevertheless responsible for the consequences of his tort. Thames v. Zerangue, 411 So.2d 17, 19 (La.1982); Walton v. William Wolf Baking Co., Inc., 406 So.2d 168, 175 (La. 1981). Our jurisprudence has also recognized that an injured plaintiff has a duty to take reasonable steps to mitigate damages. (Citations omitted). Reading these two doctrines together, we conclude that although a tortfeasor takes his victim as he finds him at the time of the injury, after that time, the victim has an affirmative responsibility to make every reasonable effort to mitigate damages.
This conclusion is in accord with the concept of mitigation in contracts in which "[t]he theory of a `duty to mitigate' is merely that avoidable consequences of a breach are not recoverable...." Electrodata Mfg. Corp. v. Domed Stadium Hotel, Inc., 362 So.2d 1122, 1126 (La.App. 4th Cir.1978), writ denied, 365 So.2d 825 (La. 1978) [citation omitted].
At the time of trial, Coffin had smoked for 24 years. Defendants assert that her hoarseness of which she complains was caused by the smoking, and that her continued smoking delayed/affected the healing process. There is no evidence of record that, if Coffin had not resumed smoking after the initial 3 to 4 week recovery period following the panendoscopy, there would be less damage to her voice or vocal cords. For these reasons, we find no error in the trial court's determination that "there is insufficient evidence to conclude that Mrs. Coffin's smoking has significantly aggravated her voice condition to the extent that she has failed to mitigate her damages."
Appellants also complain that, between 1984 and 1987, Coffin made no effort to find suitable employment.
In determining an injured person's net economic loss of earnings, one factor to be considered is the availability of reasonable employment opportunities for which the plaintiff is suited by education, *1367 experience and physical capacity. Under the doctrine of mitigation of damages, an injured person has a duty to take reasonable steps to minimize his loss. See Dunaway, supra, 428 So.2d at 1071.
At trial, Coffin admitted that she did not attempt to find employment during the first few years after the panendoscopy. During that time, she had her vocal cords stripped twice: once in November 1984 and once sometime in 1986. She indicated that her voice was "really bad and at that time [her] husband was making enough...." Coffin did not indicate that she could not seek employment during that time. To the contrary, she indicated that, because her husband's income was enough for their living expenses and because she was depressed, she did not want to look for a job. For these reasons, we find that the trial court should have reduced the amount of damages for past lost wages for Coffin's failure to mitigate damages. See and compare, Burke, supra, 554 So.2d at 190. Accordingly, we amend the judgment to subtract $5,000 due to Coffin's failure to mitigate damage from past loss of wages.

CONCLUSION
The judgment is affirmed insofar as it found defendants liable for plaintiffs' damages. We amend the judgment to reduce the total of the awards for "Predisposition to and fear of cancer", "Future medical expenses" and "Past and present mental anguish, emotional suffering and depression" from $75,000 to $10,000, and to subtract $5,000 for failure to mitigate past lost wages damages.
The judgment is accordingly amended to reflect, in favor of plaintiff Shirley V. Coffin, the following particular awards:
IT IS ORDERED, ADJUDGED AND DECREED that:
1. There be judgment herein in favor of the plaintiff, Shirley Coffin, and against the defendants, the Board of Supervisors of Louisiana State University Agricultural and Technical College, et al., in the full sum of $266,819, together with legal interest thereon from date of judicial demand until paid, with said damages itemized as follows:

LSUMC Hospital Stay $ 25,000
Permanent damage to voice, past and present loss of quality of
life due to diminished voice quality $ 50,000
Past and present mental anguish, emotional suffering and depression $ 10,000
Loss of consortium $ 15,000
 ________
 Total General Damages: $100,000
Special Damages:
A) Past Lost Wages $ 90,507
B) Loss of earning capacity $ 81,312
 ________
 Total Special Damages $171,819
 Less amount for Mrs. Coffin's failure to mitigate damages
 for past lost wages ( 5,000)
 ________
 Net Total Special Damages $166,819

*1368 In all other respects, the trial court judgment is affirmed.
Costs of this appeal are assessed one half to plaintiffs and one half to defendants.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Neither party appeals the summary judgment granted in favor of plaintiffs on the issue of liability.